## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| K.K., by and through HEATHER | : | |
| KINSINGER and DAVID KINSINGER | : | |
| and HEATHER KINSINGER and | : | |
| DAVID KINSINGER, | : | |
| Plaintiffs, | : | |
| | : | **CIVIL ACTION FILE** |
| v. | : | No.: _____ |
| FAYETTE COUNTY SCHOOL | : | |
| DISTRICT, ROSALIND GWIN, | : | |
| JONATHAN PATTERSON, | : | |
| and ERINN ANGELO. | : | **JURY REQUEST** |
| Defendants. | : | |

## COMPLAINT

COME NOW Plaintiffs K. K., by and through her parents, Heather

Kinsinger ("H.K."), and David Kinsinger ("D.K.")., and Heather Kinsinger and

David Kinsinger, personally and hereby file this civil action against Fayette

County School District ("FCSD"), its Superintendent Jonathan Patterson, its

special education director Rosalind Gwin, and principal Erinn Angelo, asserting

causes of action for retaliation in violation of the First Amendment of the

Constitution of the United States and retaliation in violation of the Americans with

Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Sec. 504"),

1

and a cause of action for defamation in violation of Georgia law against Angelo, Gwin and Patterson.

## PARTIES, JURISDICTION AND VENUE

1.

Plaintiffs Heather Kinsinger ("H.K.") and David Kinsinger ("D.K.") are the parents of K. K. a minor child of school age who is a "child with a disability" as that term is defined by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§1400 *et seq*. (2004), and by Sec. 504 of the Vocational Rehabilation Act, and by the American with Disabilities Act.  Plaintiffs (also "Family") reside in Fayette County, within the Fayette County School District, and K.K. attended Braelinn Elementary School, since 2015, through the 2020-21 school year.

2.

Defendant Fayette County School District ("FCSD") is a public corporate body and a political subdivision operating in Fayette County, Georgia, under the Constitution and laws of the State of Georgia with the capacity to sue and be sued for claims arising under the statutes herein cited. It is an educational agency under federal and state law and an "LEA" or local educational agency under IDEA. It is operated by the Fayette County Board of Education and its Superintendent. It operates concerning children with disabilities and their parents by allowing its

2

Superintendent and its Special Education Director, i.e., Patterson and Gwin, to

implement its operation and rules, and act in its name and behalf, including suing

and bringing complaints against parents, as it has done throughout 2021.

3.

Defendant Jonathan Patterson is the Superintendent of the Fayette County

School District and a resident of Fayette County. He is the highest ranking

educational administrative official in the LEA and a final decision maker. He

operates, along with the Board of Education as the LEA in its special education

programs. He was aware of and directly participated in many of the events

addressed in this Complaint in both his official and personal capacities. He was

personally aware of Defendants' prior efforts to limit the rights and impact of

parents who speak out and advocate for their children with disabilities, and he

endorsed and participated in such efforts. He was aware of the actions taken by the

District directly, through his office, and through counsel he directs for the District,

in working to limit advocacy of parents and children with disabilities, including

Plaintiffs, and he was aware of concerns with the actions of Ms. Gwin and

concerns with the procedures, programs and actions of the special education

department. Defendant Patterson was aware of and participated in the actions taken

against Plaintiffs, including criminal and slanderous allegations of fraud, breach of

FCSD rules and counsel agreements on confidentiality of records and access to private providers, and failed to intervene in and limit or prevent such actions. When contacted and given notice, he failed to allow or take remedial actions. He is sued in his personal capacity under the ADA retaliation and the First Amendment retaliation claims and as an actor and personal participant in the slander claim.

4.

Ms. Rosalind Gwin is the special education director for the Defendant District and a resident of Fayette County. She is the highest ranking special education official and has been identified as a final decision maker on many issues for the District. She has developed FCSD's special education practices, she has brought and signed due process complaints against parents in the name of FCSD and when questioned about this FCSD identified that she has such authority to act for it. She has appeared in multiple matters such as mediations, meetings and resolution meetings as having authority to commit the LEA and its resources. Defendant Gwin was aware of the actions taken by her and her staff, also allowed by Defendant Patterson, and she participated in FCSD's actions to restrict the rights of advocacy to protest their grievances by Plaintiffs concerning themselves and their daughter K.K., and as to Plaintiff H.K., the actions Plaintiff took as an advocate to provide for other children and their parents and to ensure that FCSD

meet its obligations to disabled children. This included concerns with FCSD

programs and practices for children with disabilities, especially children with

dyslexia and related impairments. When the District was given written notice by

Plaintiffs and remedial action was sought, she, along with Defendant Patterson,

declined to act. When Plaintiff H.K. raised questions to Defendant Patterson and to

Defendant FCSD, it was Defendant Gwin who he/it asked to respond.

5.

Ms. Gwin was aware of and participated in the actions taken against

Plaintiffs, the impairment of the agreement concerning such contacts and its

secrecy, and also including criminal and slanderous allegations of fraud, and failed

to intervene in and limit or prevent such actions. She is sued in her personal

capacity under the First Amendment and the ADA retaliation claims, and as a

personal participant in the slander claim.

6.

Defendant Erinn Angelo is the Principal at Braelinn Elementary School in

the Fayette County School District and a resident of Fayette County.  She

participated in the District's and its special education department's retaliation

against the Plaintiffs, and also failed to speak out, intervene or limit or prevent

such actions. She attended and participated in meetings for K.K. and other children

with disabilities at her school, and as to Plaintiffs, allowed the mistreatment of

H.K., and she was responsible directly for violation of Plaintiffs' rights as a child

and parents of a child with disabilities. She, along with Patterson, shared the

obligations of the final decision maker at her school and as to the Plaintiffs.

Defendant Angelo was aware of and participated in the actions taken against

Plaintiffs, including criminal and slanderous allegations of fraud, and made such

statements and disclosures and failed to intervene in and limit or prevent such

actions. Her actions are attributable to FCSD and she is sued in her personal

capacity under the First Amendment retaliation, the ADA retaliation and

defamation claims.

7.

This action arises under Title II of the Americans with Disabilities Act, 42

U.S.C. §§ 12132-12133 and its anti-retaliation provision at § 12203 (1990), and 28

C.F.R. Part 35; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794

and 794a, and 34 C.F.R. Part 104; 42 U.S.C. § 1983, U.S. Const. amend I and XIV;

and O.C.G.A.  §§ 51-5-1 and 51-5-4.

8.

This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §

1331 and 1343.  The Court has supplemental jurisdiction over Plaintiffs' state law

claims under 28 U.S.C. § 1367.

9.

Defendant FCSD resides within the Northern District of Georgia, Newnan

Division, and venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

10.

From as early as school began for K.K. and her siblings in Fayette County

public schools, H.K. and D.K. have been active in their child's public school

community and have advocated on behalf of their daughter K.K. related to her

educational program within the Fayette County School District.  Over time and

during the past three years, this has included their concerns with her receiving a

free and appropriate public education suited to her needs, to be accommodated and

therefore free of disability discrimination and to protect her as a child with a

disability under the IDEA, 20 U.S.C. Part 1400 *et seq.,* under the ADA and Sec.

504, and as a parent in a public school system.  Often this has focused on K.K.'s

needs, her dyslexia and adequate services and programs for such needs, but also on

how this LEA implemented programs for children with disabilities.

11.

H.K. exercised her rights as an advocate for her daughter, and then

concurrently, as she learned about the rights of parents of children with disabilities, and the science of language learning and learning disabilities, including dyslexia, she engaged in the public debate and raised questions concerning the rules and procedures followed by the District and Gwin. She questioned her child's program, and generally, the programs mandated by FCSD for disabled children.

12.

K.K.'s educational program starting in 2020 was defined in part by her Individualized Education Program ("IEP") under the Individuals with Disabilities Education Act ("IDEA"). This required a collaborative process to allocate adequate services for children with disabilities. As with most such children, she had rights to support under Sec. 504 and the ADA, as a child of school age with disabilities.

13.

In the spring of 2020, an eligibility and then IEP meeting for children with disabilities were convened by the District for K.K. and attended by Angelo and Gwin, and others. These became contentious as Gwin adversely reacted and with hostility when the Plaintiff Family raised significant concerns to the procedures followed by the District, and then to their personal treatment by Gwin and others, and to the substance of K.K.'s eligibility as a child with disabilities, and then to her placement and rights to the least restrictive placement. H.K. raised questions to

Gwin, Angelo, and the District in her meetings, personal to her but similar or the same as were raised in public forums concerning the identity and adequacy of programs for children with language and learning disabilities, including dyslexia, and questioned whether Defendants used adequate known scientific approaches to meet their needs, and questioned the procedures FCSD and Gwin allowed.

14.

Plaintiff H.K. is entitled to raise the concerns she did personally and publically and to other parents with the FCSD decision-making process, the criteria and the adequacy of the decisions made by FCSD. Gwin, FCSD special education director, embedded herself in the process and she was aware of a growing concern among parents of children with disabilities including dyslexia with her department and programs and a growing public debate questioning its efficacy. She was aware that Ms. H.K., and her advocates, were participants in that growing public debate.

15.

Georgia in May of 2019 enacted Senate Bill 48 which increased the protections for students in kindergarten through the 3rd grade with dyslexia and requiring a planning process in local districts to secure such rights. H.K., along with other parents and advocates, sought to participate and to receive and review the public records and decisions being made. Plaintiffs brought these questions into

the IEP process.

16.

H.K. as an advocate and on this issue of public interest, raised concerns and spoke out about the District's meetings, filed Georgia Open Record requests, and questioned FCSD's proceedings under SB 48 in the planning to implement its requirements. She sought to attend FCSD's planning meetings under the new law, which FCSD resisted, she sought recordings of meetings held without parents and with little notice on these issues of public and disability group concerns, she sought records of this process, and used her public rights to try and attend meetings and obtain its records, all known by Patterson, Gwin and Angelo.

17.

In the spring of 2020, D.K. and H.K. objected to the scope of FCSD's K.K. evaluations, and then to the procedures and determinations concerning whether K.K., a child with a disability with language impairments and dyslexia, was eligible under IDEA, and then to IEP and placement for K.K. made by FCSD in the meetings Gwin managed. Plaintiff raised concerns that the procedures used and the decisions made through Gwin, Angelo and others, did not meet the requirements of federal disability law, would isolate K.K. in breach of her least restrictive environment rights, and were not based on the science of learning

disability.  These were tied to the same public issue concerns on FCSD's process

and programs, and on its failure to recognize the needs of children with dyslexia.

The approaches to K.K. were consistent with concerns H.K. and others had

expressed to FCSD and Gwin concerning similarly situated children with dyslexia.

18.

Late in the spring of 2020, FCSD finally agreed that K.K. was eligible as a

student with disabilities, and in a meeting delayed until the very end of summer

vacation, an IEP was written. H.K. and D.K. felt the eligibility and then the IEP

were inadequate, and identified this to the District, and to Gwin and Angelo.

19.

Ms. Gwin, supported by Ms. Angelo at these meetings, was hostile to H.K.,

and thereby to K.K. and D.K. Defendant Gwin as the FCSD senior representative

introduced a discussion at K.K.'s 2020 spring IEP meeting by telling others Katie's

parents "think Fayette County discriminates against their dyslexic child." This had

no pedagogical basis, was unrelated to the issues of K.K.'s needs, it was insulting

and was the way that FCSD through Gwin tainted the meeting and lashed out at the

Parent to punish her for her advocacy. Angelo and other FCSD administrators

allowed this harassment without correction. This was met with a strong objection

by Plaintiffs, which at first was ignored by Gwin and Angelo. Without any

meaningful recourse and having to operate in this hostile environment to provide

for K.K., Plaintiff H.K. was forced to continue but later documented this as an

"aggressive and adverse approach to the parents and to Katie's needs, due in

substantial part for the parents' advocacy," as one of the parental concerns at the

February/March 2021 meetings, asking this be made part of the official record.

Plaintiffs concern was dismissed by Defendants throughout 2020 and 2021, and no

corrective action was ever taken by Gwin, Angelo or Patterson.

20.

In these 2020 meetings, Gwin and FCSD took other actions to undercut

H.K., or limit her advocacy and participation. K.K.'s records were difficult to

obtain. At one meeting in a room selected by Gwin and Angelo, equipped with a

white board which could show the document as it was being edited by FCSD and

allow H.K. to follow the drafting process as federal law requires it "be written at a

meeting," Gwin refused to allow use of the board as she objected to any method of

allowing the parent to see the document as it was being changed. Gwin generally

directed that electronic IEP documents not be printed or provided to the parent

even at the end of the meeting, and did so to H.K. H.K., as did other parents and

the advocate she had accompany her to the meeting, objected to this practice at her

meeting and generally as it was applied, and this was known by Angelo and Gwin.

There was no legal or pedagogical reason for these actions except to limit dissent.

21.

Several parent advocates supported families with children with disabilities in Fayette County and at special education meetings. This included Ms. Angie Wilson and Ms. Kristina Anderson, who both provided information and support by attending meetings with the Plaintiff for K.K. Gwin and Angelo disliked this process and resisted answering questions concerning FCSD's processes and programs for students with SLD (Specific Learning Disability) and children with dyslexia. Gwin and Ms. Huber (her subordinate) and yet another administrator she brought to many of the meetings, treated Ms. Anderson, then H.K., rudely and with disrespect, fostering and contributing to a hostile relationship, which in turn they focused on H.K. Plaintiff often confronted by more than a dozen employees, and then lawyers and multiple redundant FCSD administrators, had a well-established legal right to bring advocates and specialists to her child's meetings, so she elected to have Ms. Anderson in attendance. Ms. Anderson helped ask hard questions and often ones Gwin would not answer in public forums or other meetings about dyslexia programs. As an advocate, she sought the full exercise of parental rights, and would ask questions and make points Defendants did not want to answer. This imputed to and increased Defendants' hostility to Plaintiffs.

22.

School districts are required by federal law to seek and secure the consent of

parents for special education and related services <u>prior</u> to providing those services.

This is a mandatory obligation, known to Patterson, Gwin and Angelo, and a

protection for the child which Defendants are obligated to recognize and enforce.

23.

Plaintiffs believed that K.K. was a child with a learning disability and

struggled with FCSD to have her determined eligible for services and

accommodations. Unfortunately, this was common in FCSD. After the spring 2020

eligibility for Katie, there was a delay in moving forward to write the IEP and

identify the accommodations, as another meeting was not held until July 31, 2020.

During these weeks, the Defendant failed to properly secure consent to K.K.'s

eligibility and the provision of special education and related services, and the IEP

was held without consent to services. The Plaintiffs and advocate strongly voiced

their objection to the earlier eligibility limitations, and on July 31, 2020 to the plan

and proposal for services. Gwin and Angelo had been asked throughout the process

in K.K.'s personal meetings and publically what specific scientific services,

programs and approaches would be used with children with dyslexia, but FCSD

and Gwin would not answer H.K.'s questions, as the impasse grew. When the IEP

was finished with school beginning, Plaintiffs did not agree with the proposal.

24.

Despite Plaintiffs objections, FCSD, through Gwin and Angelo, unilaterally implemented the contested IEP resulting in their removing K.K. from some regular education classes for part of the day into a more restrictive program. That this was being done was not immediately clear to H.K, as FCSD provided no direct notice of these nonconsensual actions. The parents learned of Defendants' actions as this upset K.K. and then they confronted it.

25.

D.K. and H.K. objected and demanded the removal stop. FCSD through Gwin claimed erroneously that the parents had consented in writing and refused to stop, even though this was increasing Katie's anxiety at school and was upsetting to her each day. K.K. was too compliant to school authorities to refuse to be removed from her classes for SLD services, but she brought her emotional upset home. Gwin and Angelo, and another administrator, then disclosed its process of obtaining consent to services after an eligibility but before writing the IEP which identified the actual services, i.e., consent to eligibility is used as consent to any services FCSD later elected to provide. H.K. objected to this procedure and raised a concern that this eliminated informed consent to the IEP. The Plaintiffs had hired

education counsel and their attorneys raised these concerns and concurrently joined

the demand that FCSD stop the nonconsensual removal of K.K. from her regular

education classes, as illegal without consent and emotionally harmful to her as it

heightened her anxiety and fears at and about school. Gwin, Angelo and FCSD

refused to stop or alter the actions.  Plaintiffs also again identified that they

objected to the SLD services but not the language or SLI (Speech-Language

Impairment) therapy, and offered to consent to the SLI but address the SLD

separately.  Defendants refused, saying it could not be forced by the Plaintiffs to

give needed SLI therapies but not the contested removal for instruction in SLD.

26.

With K.K. and H.K. becoming increasingly upset each day with her

nonconsensual removal from class into more restrictive environments, Plaintiffs'

counsel virtually met with Ms. Gwin and the District's counsel. FCSD defended its

policy and again refused to stop the removal or to separate the SLD removal for the

SLI services, restating it was both or neither. FCSD did not claim that this was

proper for the child but only that it had the right to take this position, even when

faced with the harm it caused. Gwin told the Parents that the only alternative was

for them to withdraw their consent to all special education, and if so, both services

would be terminated. In response, Plaintiffs demanded to see the claimed consent,

16

which FCSD, through its attorney and Gwin, could not produce as it did not exist.

27.

In the interim, Plaintiff and counsel pursued FCSD's procedure to the Georgia Department of Education, questioning FCSD's approach. A conference was held on behalf of K.K. and H.K. with the State Director of Special Education and GDOE counsel, and this was known by Defendants.

28.

At this time, FCSD was increasingly the subject of other complaints about its actions, procedures and conduct filed by other parents and advocates including H.K.'s advocate with the GDOE. These arise under federal law and generate an investigation of the District. Patterson and Gwin were aware of these complaints and sought to stifle this exercise of rights protecting children with disabilities. Earlier, Ms. H.K. had filed her own complaint under state and federal law, which was investigated by GDOE, and as a conclusion some issues were rejected and another found meritorious, and FCSD was required to take corrective action concerning its failure in its special education programs.

29.

After request, then demand and threat of legal action, in the early fall of 2020, FCSD finally conceded it did not have a consent to services for K.K., and it

terminated its removal of K.K., and reached an interim accord that the Plaintiffs would give consent to SLI, but not the contested SLD for K.K. Counsel for K.K., H.K. and D.K. identified for FCSD that it had violated federal law and they had retained a claims for these actions, which was known to all Defendants.

30.

H.K., concerned with her child's program, pursued private and independent evaluations of K.K.'s needs. Some evaluations were in areas unassessed by FCSD, though it had a duty to conduct "multidisciplinary evaluations" in all areas of need, it often failed to do so. These were additional claims raised by H.K. for K.K. which she raised as public concerns.

31.

Parents under IDEA and Sec. 504 have rights to IEEs or independent educational evaluations at public expense. Once sought, the school district must either arrange for payment or seek due process to demonstrate that their evaluations were adequate. This LEA IEE due process complaint is rarely filed for many reasons as often a second opinion is welcomed, but especially for economic reasons comparing the cost of the evaluation with the cost of an administrative complaint and trial against a parent and child. K.K. sought evaluations by independent evaluators for K.K., including an evaluation for her vision and to

18

assess whether she had a need for vision therapy or special accommodations and support. Vision therapy can be a related service as part of an IEP program or Sec. 504 accommodations to avoid discriminatory instruction, but FCSD does not generally evaluate for this need. H.K. also sought independent evaluations in other areas including SLI, during Covid restrictions using some virtual evaluations.

32.

H.K. increasingly supported as an "parent – advocate" other parents of children with disabilities at Braelinn Elementary School and other FCSD schools, assisting them in understanding their rights as parents of children with disabilities, with understanding the school rules, and seeking corrective services, eligibility, evaluations and independent evaluations. She made referrals to parents to independent professionals to use for IEEs for their children at FCSD expense for psychological testing, in vision and SLI. This was known to Gwin and Angelo.

33.

FCSD experienced what it thought was a high number of objections concerning its program and services for children with language disorders and dyslexia throughout 2020-2021. Parents were seeking IEEs and Gwin and Patterson were concerned with this development and sought ways to limit it.

34.

FCSD in 2021 brought more due process complaints against parents contesting their requests for IEEs, or for second opinions, than all the rest of the 187 school districts in the state combined. These had the impact of chilling parents' exercise of this federally protected right. Most of these were against parents who were not represented by counsel, and taken in part to push back against the parent's exercise of protected federal rights, knowing such complaints would stifle or limit their advocacy. These had some success for FCSD as some unrepresented parents withdrew or inadequately settled legitimate claims. Defendants by suing parents at this frequency was known in the community, contesting these parental rights and Defendants were emboldened by this.

35.

Parents and children with disabilities may advocate and protect their children and themselves from acts of disability discrimination and the absence of appropriate services by filing what is known as a "State Complaint" with the Georgia DOE and seeking an investigation. An unusual number of these were filed by parents in Fayette County in 2020 and 2021. These were concerning Fayette County procedures, and IEEs, and were from parents supported or contacted by Ms. H.K., and by the advocates she worked with.

36.

Prior to the false accusations against Plaintiffs as to fraudulent evaluations, FCSD, through Patterson, and known by Gwin, had accused other parents of providing fraudulent reports. FCSD contacted evaluators and physicians without notice or consent, and did not stop there but told GDOE investigators that an advocate working with H.K. was probably responsible for other fraudulent reports and misrepresentations, something claimed without personal knowledge, and questionable cause. Nevertheless, this was useful to FCSD, Patterson and Gwin in defending and resolving these other complaints, and again, emboldened them.

37.

Prior to accusing H.K. of fraud and sending the May 28, 2021 letter to Mr. Zimring, Exh. 1, FCSD, Patterson, Gwin and another principal accused another parent of fraud and sent that parent a letter of such accusation to chill that parent's exercise of rights including that parent's objection to the offered program and the request for IEEs, and her GDOE complaint seeking better services for her disabled child. Allegations were also made by FCSD without cause about the child's safety and welfare. That parent standing accused of fraud and later seeking to move from Fayette County and end this matter, made conflicting statements when confronted without warning by a police detective concerning records she had provided, but

was exonerated as without cause from the false welfare allegations from FCSD.

These fraud allegations were used in a response to a GDOE complaint by FCSD,

and eventually drove this parent from Fayette County. These actions by FCSD and

the comparative success on the complaint arose prior to the meritless criminal

complaint against the Plaintiffs, and again emboldened FCSD, Patterson and Gwin.

38.

Parents have a right to maintain the confidentiality and privacy of private

professional treatment and therapies, and FCSD, as an educational agency, must

seek consent to pierce the confidentiality and privacy of the child and parents with

therapists, doctors, evaluators and private professionals. This process requires

FCSD, and in turn, Patterson, Angelo and Gwin to give notice and seek informed

consent for such access. Defendants each know that they cannot independently

pierce such privacy rights without informed consent, and once it is sought and

given, they each know that it must be followed and allowed.

39.

In August of 2020, H.K and D.K. had obtained a private vision evaluation of

K.K. by Dr. Nicole Gurbal, O.D., FCOVD, a developmental optometrist. This

evaluation, *inter alia* found that K.K. had the visual conditions of Ocular Motor

Dysfunction and Convergence Excess, in a report of evaluation of August 26, 2020

and first sent in writing to the parents on or about September 15, 2020.

40.

Dr. Gurbal recommended vision therapy and reevaluation in 3-4 months. She also made accommodation recommendations for K.K. including "enlarged font," but did not initially state the size of font. Upon receipt of the evaluation, H.K. asked Dr. Gurbal to identify the proper size font, and Dr. Gurbal edited her report, overriding the first version she had sent to H.K. and added that this should be "(18 point)" on page 4 of the report on September 16 or 17, 2020. She sent both the initial version and the edited and final version by email copy to H.K., in a pdf format and password protected, with the same file name.

41.

An IEP team meeting was scheduled for K.K. for February 22, 2021. This was the first available meeting where FCSD could consider the Gurbal vision evaluation of K.K., and two other private evaluations. At this meeting and in preparation for this meeting, there were a number of questions and conflicts between the District, and Gwin, and the Plaintiffs, some directly and some through counsel. FCSD required these be virtual meetings, which also was a concern, as was the lack of access to the documents as they were written, concern with the practice of FCSD to leave the meeting without sharing the plan as it was written by

this "team," and then unilaterally complete the documents and write so-called

"minutes" after the meeting. FCSD refused to allow access to the document drafts

written, just as it had refused to allow parents to see the drafts as they were written

the year before. The solution H.K. sought was just to leave the meeting with the

drafts as they stood at the time and then "there would not be an issue." In emails on

February 24 and 25, 2021 to Ms. Morris attorney for FCSD, concerns with FCSD's

withholding of the contemporaneous documents for changes and writing "minutes"

after the meeting, often seen as having alterations from the actual course of the

meeting, was properly characterized as altering and misrepresenting the events in a

child's records, perhaps a description that hit Defendants too close to home.

Resolving these issues was rejected by FCSD, even though Plaintiffs identified that

this would increase confidence in the process, with FCSD counsel saying that

after-the-fact objections "could be submitted," generally a meaningless gesture

which did not solve the problem. There were continuing conflicts between H.K., as

with other parents and advocates, on these FCSD practices, and on the criteria

FCSD used in often denying or limiting services sought by children with learning

disabilities, and on the lack of answers to the scientific approach to dyslexia.

42.

In advance of the February 22, 2021 IEP meeting, and initially believing that

the meeting would address the three private evaluations, H.K. determined that it was appropriate to share the three reports she had from private independent professionals in advance of the meeting with FCSD. To accomplish this the Family's counsel, Jonathan Zimring, emailed private evaluations of K.K. to FCSD's counsel, Beth Morris. These included the private vision evaluation report prepared by Dr. Nicole Gurbal, dated August 26, 2020.  This was a report provided from H.K.'s attorney as H.K. was not available to directly send the report to Gwin (and Ms. Huber, her assistance director).

43.

Dr. Gurbal's report was in a password protected format, initially unbeknownst to Mr. Zimring, as it was simply forwarded to FCSD per Ms. Morris' request. Ms. Morris emailed Mr. Zimring on February 15, 2021, asking him to send the password for Dr. Gurbal's report or to:

> "… send it in a format that can be opened."

Id. Mr. Zimring complied with Ms. Morris's request by obtaining the password, opening the document, reformatting and saving it before sending this new file to Ms. Morris, so it could be read without its password. Ms. Morris was sent an email on 2/16/2021 at 12:43 pm from Mr. Zimring that "We have resaved the document."

44.

On February 22, 2021, an IEP meeting was held, and H.K. attended the

meeting with Mr. Zimring and with an advocate, Kristina Anderson. The IEP team

also included multiple FCSD administrators, teachers and staff, over a dozen

persons, including Ms. Angelo, Gwin, and FCSD counsel Ms. Morris.

45.

This was a virtual meeting, and as there was a delay in someone logging in,

FCSD suggested discussing the evaluation report by Dr. Gurbal.  It was not shown

or fully shown virtually, and there was little discussion about it at the time.

Plaintiffs and advocate Anderson had the final report dated August 26, 2020 and

were not aware as this meeting began that the first draft, also dated August 26,

2020 and with an identical file name, had been inadvertently sent to Ms. Morris

after reformatting, but this first version did not include the last page's "18 Font"

directive following the recommendation that increased font size must be used. As

Dr. Gurbal had recommended use of an 18-point font for K.K., advocate Ms.

Anderson asked whether teachers were using an 18-point font. The FCSD

representatives identified that the report provided to them did not specify the font

size.  Mr. Zimring clarified to FCSD, Gwin and Angelo, Ms. Morris and the some

other dozen FCSD persons in the zoom meeting that there was a revised version of

the report which specifically recommended use of an 18-point font, and that

perhaps this had not been shared with the team.  During the meeting, Mr. Zimring

and H.K. discovered the draft version without the font size identification had been

the document initially reformatted and inadvertently sent to Ms. Morris, rather than

the final version which Dr. Gurbal had edited on September 16 or 17, 2020. From

this meeting forward, all Defendants knew there was a draft and a revised final

report identifying the font size at the end with other recommendations.

46.

Dr. Gurbal, as with many private and public evaluators, follows an

appropriate and ethical practice of sending parents reports of evaluations of their

children for their review and feedback. This can lead to corrections of information,

or a better understanding of the science, or as here, to more specific clarification of

recommendations so that these can be readily implemented by others. This is

known to Defendants Gwin and Angelo. As they knew from Dr. Gurbal, she will

include the recommended font size if asked to do so by parents for clarity and

implementation of accommodations.

47.

Fayette County evaluators have in the past reviewed their own staff's reports

initially sent to parents, which upon review they saw as needing changes or

correction, and have made such corrections with re-submitted changed reports.

This has been done with the knowledge of Gwin, and others including Ms. Huber

who FCSD brought to the K.K. meetings, and as to this process, Gwin, Huber,

Angelo and FCSD have not claimed that this was their "fraud" or an illegal

alteration of evaluation and government documents.

48.

The Gurbal evaluation on August 26, 2021 was a private evaluation, sought

and funded by the Plaintiffs to assist K.K. in school and to understand her needs as

a child with disabilities. It can become part of K.K.'s educational record as FCSD

has a duty to maintain it confidentially, as it must also respect her other privacy

rights. She also has HIPAA and other privacy rights with such evaluators.

49.

The Plaintiffs' provision of private evaluations to FCSD does not authorize

FCSD to pierce any other HIPAA restrictions, privacy or confidentiality rights

between the private professional and the parent. Defendants under State and

Federal law must seek and obtain consent or authorization to invade these rights of

children with private providers, as they know and told H.K. and D.K.

50.

After the IEP meeting, on February 25, 2021, Mr. Zimring emailed the final

28

version of Dr. Gurbal's August 26, 2020 report to Ms. Morris.  As the report was

password protected as received from Dr. Gurbal, Mr. Zimring again opened,

resaved and reformatted it to allow access pursuant to Ms. Morris's earlier

instructions. This report was *identical* to the final report provided to the Family by

Dr. Gurbal except that bullet points for each recommendation on page 4 were

missing as a result of its handling and reformatting, as FCSD and Morris had

requested. This report was *never* used by the IEP team.

51.

In a February 25, 2021 email to Ms. Morris, among other procedural

concerns, were questions with consent and access, as Mr. Zimring stated "This

process of providing evaluations is not intended to be a waiver of any other rights

or privileges" and raised concerns that letters and releases provided by FCSD to

the Family "are not consistent with what was discussed" at the IEP meeting.  Mr.

Zimring further stated to Ms. Morris that:

> The discussion generated an understanding that Ms. Kinsinger would
> consent to information requests and questions with these independent
> experts but would have the questions and areas identified in advance and an
> opportunity to participate in any such discussion concerning her daughter.
> The release forms and your emails do not address this understanding, as in
> fact they abrogate it. *The parents have a right to participate in any such
> contacts especially as this will avoid a conflict over what was said later*. As
> an alternative, and one we presented, the experts can simply participate at
> the IEP meeting, and if that is the result, the releases are overly broad and

allow access beyond that discussed or needed. We do not object to contacts solely for arranging for payment and sending notices, and my client will ensure the expert understands this may occur. *So, we need a clear commitment as to what is being done as the releases raise questions on what we thought was resolve[d], we ask that these be specific and to have the issues and scope of these corrected.*

Exh. 6 (email Zimring to Morris, 2/25/2021)(emphasis supplied).

52.

In response to Mr. Zimring's February 25 email, Ms. Morris emailed that, "In the meeting, the District already agreed to the family participating in communications with the providers should they be needed." Exh. 6 (email Morris to Zimring, 2/25/2021)(referencing the February 22, 2021 meeting). This was understood by all, including Defendants, to mean that Plaintiffs would allow and consent to contacts and communications with private evaluators but that the parties agreed that this would be with notice and the parents' and FCSD's mutual participation. Morris and FCSD sought no exceptions to this duty to provide H.K. notice and the opportunity to participate in any discussions Gwin, Patterson, or Angelo had with Dr. Gurbal. Morris, for FCSD, induced H.K into relying on this stated understanding of the extent of the release and its meaning.

53.

At the next IEP meeting for K.K. on March 4, 2021, H.K. told the team that

K.K. was scheduled for a follow up appointment with Dr. Gurbal. She supported

waiting until the reevaluation before addressing vision or the substance of the

Gurbal evaluation, and to use that as the source of IEP Team consideration.  The

IEP team did not consider Dr. Gurbal's evaluation at this meeting as the mutual

decision supported by Gwin and Angelo was that the August 26, 2021 report was

outdated and, its recommendation for a reevaluation after the at-home therapy K.K.

received was scheduled that same week, the new report would be the evaluation

reviewed. Thus, neither the draft without the font size nor the final report with font

size both dated August 26, 2020 but one without bullets as sent to Morris were

reviewed on March 4, 2021, as FCSD, Gwin, Angelo, and others agreed that the

process would be that the March 2021 report would be shared and then reviewed.

54.

On March 18, 2021, H.K. sent Gwin the report by Dr. Gurbal of K.K's

evaluation of March 6, 2021.  This *again* recommended use of an 18-point font and

was sent by H.K. with the password removed. After receiving this report Gwin,

Patterson and Angelo were aware that the evaluator's March 2021

recommendation tracked the August 2020 evaluation by including an 18-point font.

55.

On March 23, 2021, the IEP team reconvened and discussed the updated

31

report provided by H.K. on March 18. At no time during this meeting or earlier did FCSD, its counsel, Gwin, Angelo, Patterson or anyone else for FCSD identify any objection or concern with the reformatted report of Dr. Gurbal from August 2020.

56.

On April 28, 2021, unbeknownst to the Family, Principal Angelo, intentionally breaching privacy and the agreement between FCSD and D.K. and H.K. concerning contacts with the Plaintiffs' private professionals, secretly called Dr. Gurbal to question her about reports. She asked if the vision reports the Family had provided to FCSD regarding K.K. were authentic, or as she said to Dr. Gurbal, were fraud. Ms. Angelo did not disclose that Ms. Morris had asked Mr. Zimring to reformat the report, nor how these had been used, or not used, nor did she establish that she did not have consent or authorization for these discussions, nor that the very agreement was that there would be mutual contacts only, with evaluators. Angelo, as known to Gwin, and later to Patterson, discussed aspects of K.K.'s program without consent and contrary to the understanding concerning privacy.

57.

Ms. Angelo did not notify the Family of her intent to contact Dr. Gurbal, nor seek to include the Plaintiffs in this conversation, nor tell them that it had occurred. As defined under Georgia law, and as understood generally, Angelo had no

reasonable cause or basis for stating or suggesting any report was fraud.

58.

Neither Gwin nor Angelo, informed D.K. or H.K. of any concerns they might have had with any Gurbal report or its authenticity, nor did Patterson direct that they should do so. FCSD's attorney Ms. Morris did not convey or identify any concern in their behalf, or her concern, to attorneys for K.K. and H.K. If this issue had been identified to Plaintiffs, it would have been readily resolved and would have conclusively demonstrated the absence of fraud or any attempt to deceive.

59.

Angelo, in her call to Dr. Gurbal, indicated she knew it was without consent but talked Dr. Gurbal into responding, claiming she really was not talking about H.K., K.K., or the evaluation, which was a frivolous distinction to protect her invasion of the confidentiality understanding and laws. Angelo, as was planned, also did not disclose to Dr. Gurbal that the first draft without the font size had never been fully presented to the Team and that the IEP Team had only reviewed the March 6, 2021 evaluation in its full IEP review for K.K.

60.

On or about April 28, 2021, Ms. Angelo emailed Sierra at the Vision Performance Center, the office of Dr. Gurbal, following up on her unauthorized

questioning of Dr. Gurbal. Angelo attached three electronic copies of vision reports to her email and requested that Dr. Gurbal "verify which documents were created by her," stating that "[w]e need to confirm that the educational records are accurate and authentic." This did not describe how, if at all, either form had been used.

61.

On April 29, 2021, Sierra emailed Ms. Angelo a signed note from Dr. Gurbal which confirmed that Dr. Gurbal had created the report provided by Mr. Zimring on February 11 (labeled by Ms. Angelo as "Document # 1") and the updated report provided by H.K. on March 18 (labeled by as "Document # 3").

62.

In Angelo's questioning, Dr. Gurbal told Ms. Angelo that she did not take out the bullets but *that the report as final with the recommendation of an 18-point font was sent from her office* and *was identical in all respects with the version sent by Mr. Zimring to FCSD on February 25 but without the bullets,* i.e., that there were no textual changes and that report was her words, just without the bullets. She also confirmed that she did in fact recommend "18 point font" in September 2020 as she modified her Aug. 26, 2020 report and again recommended this in March 2021. Dr. Gurbal later explained that she answered honestly to the email question Angelo framed as she had not eliminated the bullets in her original document.

34

63.

Angelo shared her emails and conversations with Patterson and Gwin. Each knew that the reports without font size and bullets had not been fully reviewed by the K.K. IEP team, each knew the evaluation which was reviewed was confirmed as textually accurate by Dr. Gurbal and as her work and recommendations, each knew or should have known as each had a duty to ask and protect the child and parents' rights, that they had contacted Dr. Gurbal without notice or consent, and in secret. Angelo knew that Dr. Gurbal had suggested that the loss of bullets was perhaps just a result of reformatting as she sends the documents password sealed and in locked format to comply with HIPAA but that these need to be opened for an IEP team. Each knew that there was no intentional or actionable fraud, or fraud of any kind or any intention to mislead, each knew that when Plaintiff H.K. discovered that FCSD had the preliminary document and not the final report written by D. Gurbal that the final report was provided to correct the inadvertent action of sending an identically labeled original in a computer file, and each knew what they had done was done secretly, to avoid  seeking an explanation from H.K., or her counsel, or the true facts. Each knew that the recommendation that was actually made in 2020, and then made again in March 2021 after the second evaluation, was that K.K. should be accommodated so as to avoid discriminatory

instruction she cannot read with "point-18" type. Each as educators professionally

knew the meaning of "fraud" and that a report which was reformatted which lost

its bullets on page 4 of its recommendations was not done to defraud. Each could

have further investigated and this would have confronted the truth that there was

no fraudulent or criminal action, and knew or should have known through their

counsel that there was no willful concealment, or scheme, or false representation,

or intentional use of a false writing, knowing the same to be a fraudulent statement,

and no crime and no therefore no fraud. See, e.g., O.C.G.A § 16-10-20(2019).

64.

On or about May 3, 2021, Ms. Angelo contacted the Peachtree City Police

and reported that Plaintiffs had committed fraud by providing fraudulent

documentation to the School District in Dr. Gurbal's report. This allegation was

not identified for H.K. or D.K., nor by Morris to Zimring but was done amongst

FCSD, its counsel, Patterson and Gwin. Each knew that this would lead to release

of confidential information. Each knew that the sole difference in one August 2020

report were bullet signals and that the March 2021 reports' 18-font was identical.

Each knew there was no cause for the allegations of criminal misconduct or fraud.

65.

Peachtree City Police Det. Thomas Duckett responded on May 3, 2021, to

talk with Ms. Angelo, who completed a "Victim/Witness Statement."

66.

At the time Ms. Angelo contacted the police, she knew, as did FCSD and

Gwin, that the text of the report sent to FCSD by Mr. Zimring on February 25 was

consistent with Dr. Gurbal's recommendations, including that Dr. Gurbal

recommended use of an 18-point font, and that there were no textual changes in the

report, only missing bullet points.  Ms. Angelo did not identify this to the police, or

clarify it in her statement, as she and as directed and joined by the other

Defendants, sought to use the allegation against H.K. and perhaps her attorney.

67.

On May 17, 2021, Ms. Angelo emailed Lt. Bradley Williams of the

Peachtree City Police for an update on the investigation, and in a follow up email

said she needed to know whether the Family was "in the loop" regarding his

investigation because past meetings with H.K. had been "uncomfortable" and she

was "trying to plan accordingly" for a new meeting. She was seeking whether her

false allegations were known to Plaintiffs, and to plan for that so she and Gwin

could anticipate its chill on the meeting.

68.

Lt. Williams confirmed to Ms. Angelo on May 17, 2021, that the detective

on the case had not informed the family and Plaintiffs should be unaware of the investigation. FCSD and Angelo determined, again, to keep secret their allegations against the Plaintiffs, and avoid the innocent explanation, but after the meeting which resulted in additional objectionable decisions about K.K., directed their counsel to send a notice in a way that would have a maximum adverse impact on the Plaintiffs and their continuing advocacy for K.K. and other children.

69.

On or about May 28, 2021, at the end of the Friday before Memorial Day, Ms. Morris sent a letter to Mr. Zimring that stated that the vision evaluation sent by Mr. Zimring on February 25, 2021:

> "is fraudulent" and "does not accurately reflect the letter as she wrote it or was altered prior to being provided to the District."

Exh. 1. Morris in this letter did not identify any facts to support this accusation, but wrote that "falsifying, forging and defrauding documentation and/or knowingly presenting such documents to a government entity is a violation of the law and a violation of the Code of Ethics and Rules of Professional Conduct" and that the District was "considering all legal remedies available to it." Id.

70.

This letter by Morris was presented in behalf of her client FCSD, and was

38

copied to Gwin and Patterson. It was made available to Angelo. Attached hereto as

Pl. Complaint Exh. 1 is a true copy of this letter. Ms. Morris understanding the

adverse impact the letter would have, sent it at 4:38 on a Friday before the holiday

weekend after almost a month after the police complaint, signed her email with:

> "Have a good weekend, Beth Morris."

Exhibit 2. This was intentionally done in bad faith, compounding the malice.

71.

Mr. Zimring responded to Ms. Morris on the next work day, sending three

letters, two on June 1, 2021, and one on June 4, 2021, *inter alia* inviting Ms.

Morris to contact the State Bar of Georgia if she had concerns sufficient to allege

she had an ethical complaint and seeking specific information to understand the

scope of her letter's claims of criminal and unethical fraudulent conduct as FCSD

claimed against the Plaintiffs.  Mr. Zimring provided FCSD through Morris, and

Morris, contact information and email addresses for Bar complaints and links to

the Bar including the Bar and Ethical rules, the telephone of the Office of General

Counsel and a specific link for complaints, if as FCSD alleged, fraudulent

documents had been used by H.K's and K.K.'s counsel in their behalf. In this first

response, Plaintiffs through counsel asked for an explanation as "[w]e take your

accusations quite seriously and want this promptly resolved with the concerns clear

39

and any inquiry completed."  Attached hereto as Exh. 3 is a true copy of this letter.

72.

On June 1, 2021 Plaintiffs' and Mr. Zimring's second letter to Defendants

through Ms. Morris, addressed that the allegations were "vague" and "this makes it

quite difficult to understand … and to address them appropriately. The innuendo

makes it impossible to address adequately in good faith…" Plaintiffs sought to

understand what supported the claims and to whom these accusations were stated

so that further publication of slanderous accusations could be limited, and again

repeated that FCSD and Morris were free to file good faith complaints or to contact

the Bar to file such complaint(s). Exhibit 4 is a true copy of this second letter.

73.

When no response was received, a third letter to Morris was sent on June 4,

2021further responding to her letter of May 28, 2021. This noted FCSD/Morris'

failure to respond and again provided information and a link to file disciplinary

complaints with the State Bar of Georgia, as FCSD through its counsel had made

such an allegation. This third letter again identified the request for specifics so the

issue could be addressed, and asked if Morris represented Angelo, so that *inter*

*alia*, if she and the District had a conflict then there was time to take action and a

forum to resolve the facts, and to also allow Morris to "inform Ms. Angelo that she

may need to seek or consider separate counsel." Exh. 5 is a true copy of this letter.

74.

Mr. Zimring promptly informed H.K. and D.K. of these allegations which were like a sledgehammer on their life, and a direct and veiled threat which upset them, as had been planned and timed by FCSD and all the Defendants. This action limited and chilled the Plaintiffs' exercise of their rights in behalf of K.K. and further advocacy and open participation in behalf of other children, especially as the allegations remained unresolved. Seeking to correct the inadequate services with the same administrators who had accused them of undefined criminal fraud put this on hold, as it chilled H.K's actions for others. This episode was traumatic for the Plaintiffs, as it would be for any parent to be accused by school officials of significant felonies and threatened potential civil actions against them and also against their counsel, with three minor children in Fayette County schools. Up to this point D.K. and H.K were deeply involved in the public education of all 3 children, trying to be active parents at their schools.

75.

Plaintiffs contacted Dr. Gurbal and asked what happened. She forwarded the emails she had received from Angelo and explained that she had explained to Angelo that there was no difference in the language and text of the final revised

Aug. 26, 2020 report and that Angelo was told that she, not H.K. or counsel had

added the font size. She said she had said that the middle version of her report was

not hers based on how the Angelo email was worded as it had no bullets as she put

in bullets but that she thought this was a reformatting issue.

76.

Ms. Morris did not respond to any of Mr. Zimring's 3 letters of June 1 and 4,

nor did she ever provide *any* information to explain her May 28 letter or the

allegations she made against the Plaintiffs. FCSD kept silent to Plaintiffs, allowing

this threatening letter of May 28, 2021 to stand unexplained, and without

discussion, nor further investigation or any attempt at a good faith resolution. The

allegations remained vague and ambiguous, stifling any remedial actions or simple

explanations. These were explanations of facts Defendants did not want to hear.

77.

The Family did not learn that there was actually a criminal complaint, nor of

the investigation generated by the meritless allegations, until Ms. Angelo sent a

letter to H.K. and D.K. on or about June 10, 2021, identifying that a subpoena to a

Grand Jury had been issued to FCSD seeking the identity of "K.K." with regard to

the Dr. Gurbal's report. The protection from this disclosure without notice is

another right of the Plaintiffs under the FERPA, 20 U.S.C. § 1232g, the Family

42

Educational Rights and Privacy Act, the same law Angelo and FCSD had breached

in their nonconsensual contacts to Dr. Gurbal.  Exhibit 7 is a true copy of this

letter. Though faced with this subpoena, Morris and Angelo still would not identify

or describe the stated problem and their criminal allegations. Under the subpoena,

K.K.'s identity was disclosed by Angelo. Plaintiffs were still not told the substance

of the allegations made through Angelo, nor of their basis or cause.

78.

Later, on June 17, 2021 a second subpoena to the Grand Jury for K.K.'s

confidential educational and school records was sent by an Assistant District

Attorney for Fayette County, generating a second notice sent by Ms. Angelo on or

about June 29, 2021. During these weeks, no one from FCSD, nor Morris,

responded to define the specifics of the allegations or requests for this information.

On July 8, 2021 Angelo disclosed K.K.'s school records to the police.

79.

The Family, in response to FCSD's complaint of fraud and the allegations of

criminal conduct from FCSD, Patterson, and Gwin, retained an attorney, Mr.

Ballard, to investigate the allegations and to represent them.

80.

The Family, with nothing to hide, consented to allow Det. Duckett access to

K.K.'s records and to interview Dr. Gurbal. The Peachtree City Police sought

consent to discuss the evaluations with Dr. Gurbal, something Defendants ignored.

81.

Det. Duckett, in the course of his investigation, reviewed all the Dr. Gurbal

reports and interviewed Dr. Gurbal, Mr. Zimring, and Mr. Ballard, after

interviewing and having Angelo write a statement, following her call to the police.

82.

In these interviews, Dr. Gurbal confirmed that she had modified her original

report dated August 26, 2021 on or about September 16 or 17, 2021, to add the

"18-point font" recommendation and had resaved it over the original. Her office

had then sent this report, password protected for HIPAA compliance in a locked

format but same named, to Ms. H.K. She provided this final report to Det. Duckett.

83.

Detective Duckett determined that the differences between Dr. Gurbal's

report and the version provided by Mr. Zimring to FCSD with missing bullets on

February 25 were the result of the report being reformatted.

84.

On September 27, 2021, the Peachtree City Policy Department concluded

that there was not probable cause of a criminal incident and no charges were filed.

The case was closed as "UNFOUNDED" and identified to H.K.'s counsel as without probable cause.

85.

During the summer of 2021 with the allegations unclear and outstanding against K.K., H.K., and D.K., and with FCSD, Patterson, Gwin and Angelo refusing to explain anything or even discuss and perhaps resolve the issue, and still concerned with the treatment from Gwin and others dating back more than a year, Plaintiffs had to question their three (3) school age children's safety in FCSD schools and their ability to protect the rights of their children and themselves in an educational environment which FCSD had made hostile to them. If the matter was before the Grand Jury in September or not promptly resolved, the continued placement of their youngest child in a school managed by their accuser, was imperiled. This was a direct and foreseeable outcome of Defendants' actions and hostility, and a reasonable response from any parent in like circumstances.

86.

Plaintiffs sought to address these issues with Angelo and to determine if it was safe for their child to attend a school she ran for Patterson and FCSD, and so they authorized Mr. Zimring to have that conversation as they stood accused of

fraud by Angelo's claim. Mr. Zimring had asked Ms. Morris if she represented Ms. Angelo, and after a series of communications, FCSD through Ms. Morris, and Morris, *refused* to respond if Ms. Angelo, the then known alleger, was represented by her or her client, but FCSD through Morris directed that any and all contacts and requests be made *only* to Morris. Morris and therefore Patterson and FCSD knew that this would cut off any communications with Angelo, on pain of further allegations of ethical and legal misconduct. This again cut off any communications on the issue. Plaintiffs later sought FCSD's policies and were told by Morris that this representation depended on FCSD. There was no legitimate basis for FCSD, Patterson and his/its attorney Morris, to refuse to allow an identification of whether Morris also represented Angelo or if Angelo had been informed of the request.

87.

Plaintiffs concluded that their children could not be safely educated at Braelinn E.S. or any FCSD school, with these open allegations against them by Patterson, Gwin and Angelo and their stonewalling. This drove them to consider accessible private schools, including Landmark Christian School in Fairburn. To have their applications processed, Plaintiffs had to inform Braelinn E. S. and FCSD of their need for education records and other information to be sent to the private school for review. They told no one else except close family members and their

advocates but had to tell FCSD staff at Angelo's school about their plan to apply to Landmark Christian School.

88.

Prior to the Plaintiff children's acceptance at Landmark Christian School, where they ultimately enrolled, that school received an anonymous unsigned letter slandering the Family and H.K., stating that they should not be admitted because they sued schools.

89.

K.K. and her two siblings enrolled in Landmark Christian School with a private tuition cost for the 2021-2022 school year, where they are safe in an appropriate educational environment and treated respectfully, as are H.K. and D.K. as concerned parents.

90.

After having the allegations terminated as without cause, H.K. has continued her advocacy for the public education students in Fayette County. This has included appearing before the FCSD Board in its open meeting format and raising questions concerning its program and services for children with disabilities, particularly children with dyslexia. In this process and in open meetings she has been treated rudely, with disrespect, and unbecoming of the Board and

administration, treatment which was improper and unrelated to her actions and demeanor at the meeting. Independent professionals have objected to Defendant Patterson and FCSD about this conduct, identifying that in these meetings in a public format H.K. was cut off, with FCSD claiming this was needed as she was not going to "abuse individuals." No such action was taken or stated by H.K., and this was perhaps FCSD renewing false allegations against her and trying to taint her rights of public comment and advocacy.

91.

The criminal allegations of fraud, though dismissed by the police after investigation as unfounded and without probable cause, were never explained or addressed by FCSD, Patterson, Gwin or Angelo. No apology was sent, no notice ever provided. No State Bar complaint was ever filed by them or their counsel for them or for herself, though there was a separate ethical duty to do so if the allegation made on May 28, 2021 had any legitimate cause. Patterson, Gwin and Angelo were each aware H.K. was advocating for her daughter and at that same time for other children with disabilities, questioning FCSD, Patterson and Gwin's approach and procedures and seeking changes in its programs and services. They were aware she was part of a growing group of parents raising questions about Defendants' services for children with dyslexia, its curriculum for such children

with disabilities, and its procedure and criteria for determining whether children

with disabilities could receive supports and appropriate instruction. They were

aware that D.K., H.K, and K.K., had a right to be free from retaliation for such

actions, and that they each had a duty to refrain from such retaliatory actions.

Patterson and Gwin had a duty to act to ensure that those they managed and

supervised did not retaliate or chill Plaintiffs' exercise of such protected rights.

Patterson had a duty to ensure that the actions taken by the District through its

attorney, and the actions he endorsed and allowed, did not retaliate or serve to chill

the exercise of such protected rights.

92.

These actions of Defendants were directed at Plaintiffs and the support they

had from other parents and advocates, and the assistance they received from

advocates helping them personally, and counsel, and were intended to stifle and

limit such actions and to put a cost on such advocacy, and to taint H.K.'s

reputation and standing among its staff and perhaps with parents, as Gwin had in

the March 2020 meeting, and to chill the actions she took and the public and

private concerns she identified.

93.

The actions taken through the criminal allegations and the May 28, 2021

letter concerning Plaintiffs' counsel, acting for Plaintiffs, were knowingly false and incomplete as presented, and were themselves improper in threatening criminal and ethical complaints solely for the purpose of obtaining tactical advantages in civil matters and to chill actions in federally protected advocacy for K.K and H.K.

94.

The actions of Defendants foreseeably resulted in actual costs and special damages to H.K. and D.K., including the costs of counsel for the criminal allegations and the costs of private school once the educational environmental was tainted by Defendants and Defendants refused to explain or address the issues. The allegations made to Gurbal, Zimring and the police were slander, as were allegations of crimes was slander *per se.*

## **CLAIMS FOR RELIEF**

### **COUNT 1:  Retaliation in Violation of the ADA and Section 504**

95.

The foregoing facts and paras. 1-94, 120-125, 129-132 are incorporated.

96.

Title II of the Americans with Disabilities Act makes it unlawful for a public entity to discriminate on the basis of disability, providing:

50

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132; see also 28 C.F.R. Part 35.

97.

The ADA prohibits retaliation against any individual for opposing actions

made unlawful by the Act, including by Section 12132, providing that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA].

42 U.S.C. § 12203(a).

98.

The ADA also prohibits interference, coercion, or intimidation with the

exercise of rights protected by the Act:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b).

99.

The remedies and procedures available under 42 U.S.C. § 12133 "shall be

available to aggrieved persons" for violations of 42 U.S.C. § 12203(a) or (b), with respect to Title II of the ADA.  42 U.S.C. § 12203(c).  These include the "remedies, procedures, and rights set forth in section 794a of Title 29." 42 U.S.C. § 12133.  This reference to Sec. 504's remedial provision, in turn for the ADA, incorporates the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (or 42 U.S.C. § 2000d *et seq.*).

100.

The ADA may be privately enforced by the Plaintiffs, and in claims of retaliation, Plaintiffs may raise claims as against the public entity, and relevant discriminating and retaliating persons.  See e.g., Shotz v. City of Plantation, Florida, 344 F.3d 1161 (11th Cir. 2003). Such claims of retaliation are brought against all the individual defendants and against the institutional defendant.

101.

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of disability, providing that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  See also 34 C.F.R. § 104.4.

102.

Section 504 incorporates the "remedies, procedures, and rights" of Title VI of

the Civil Rights Act, which prohibit retaliation:

> No recipient or other person shall intimidate, threaten, coerce, or
> discriminate against any individual for the purpose of interfering with any
> right or privilege secured by section 601 of the [Civil Rights Act of 1964] or
> this part, or because he has made a complaint, testified, assisted, or
> participated in any manner in an investigation, proceeding or hearing under
> this part.

34 C.F.R. § 100.7(e).  This regulation applies to any right or privilege secured by

the Rehabilitation Act. 34 C.F.R. § 104.61.

103.

Sec. 504 permits claims against federal fund recipients, and FCSD is a

recipient of such funds in its educational programs. The Sec. 504 claim is brought

against FCSD and not the individual Defendants.

104.

Plaintiffs' advocacy on behalf of K.K and on behalf of other students with

disabilities on issues relating to their federal and state educational rights is

"protected activity" under the ADA and Section 504.

105.

Ms. Angelo, Ms. Gwin and Supt. Patterson were aware of Plaintiffs'

advocacy on behalf of K.K. and other students with disabilities. They were aware
that these raised issue of public concern about its programs, procedures and
services for children with disabilities, and aware that H.K. talked with and
discussed the personal situations of other parents with them.

106.

Ms. Angelo's filing of a false police report and/or a report with significant
omissions of facts to mislead, all as known to her and which limited or altered the
meaning of her allegations against the Plaintiffs, and FCSD's counsel's threat of
criminal action or civil action against H.K. and/or D.K., and also to initiate without
cause a criminal action and/or a bar grievance against Plaintiffs' counsel
advocating in Plaintiffs' behalf, were "adverse actions" against Plaintiffs within the
meaning of the ADA and Section 504.  These retaliatory actions forced the Parents
to retain the services of another attorney to defend against the baseless but
nefariously initiated vague accusations against them and their attorney.  These
polluted the environment and chilled Plaintiffs from further advocacy for their
children and for others within the school system, and tainted the educational
environment for the entire Family. These were pursued to chill and deter H.K.
from further pursing statutory protected rights under the disability discrimination
laws. Defendants' adverse actions against Plaintiffs were reasonably likely to deter

Plaintiffs and others from engaging in the protected activity of advocating on behalf of their children and other students with disabilities, as was known to Defendants and foreseeable. Such actions were magnified by the Defendants intentional failure to inquire prior to making criminal allegations, the knowing withholding of facts, the refusal to explain even counsel to counsel, the refusal to pursue or file a Bar complaint against Plaintiffs' counsel after alleging potential bar violations and the impermissible use of such allegations without cause for tactical reasons, the refusal to identify the allegations when made, or for months, the scope of the threatening letter of May 28, 2021. Since the termination of the criminal allegations as without cause, there has been no response or explanation or apology. There never was a Bar complaint filed.

107.

There was a causal connection between Defendants' adverse actions against Plaintiffs and Plaintiffs' protected activity personally and as a parent for her children with disabilities, and separately in behalf of her children and others on matters generic to all such children on public issues. The temporal proximity between H.K's objections and actions, the growing number of complaints of parents on like and similar topics, the apparent success of a fraud allegation to chill another parent, the parents' identification of their concerns with their treatment and

harassment due to their advocacy, all reaching a point in March and April 2021 where FCSD determined to strike out against these Parents, and perhaps others. The use of impermissible secret contacts to third party evaluators and the breach of the agreement preventing this were improper, illegal and used to allow the false allegations, and in turn constituted actions outside the Defendants' authority and discretion. The secrecy of the actions provided protection from exposure and allowed the use of unexplained vague allegations, further demonstrating that the adverse actions against Plaintiffs were a response to Plaintiffs' protected activity and personal claims, used to actually retaliate against the Plaintiffs.

108.

As set forth herein, Plaintiffs have been harmed and damaged by Defendant FCSD's intentional retaliation in violation of the ADA and Section 504, and they are entitled to recover all relief allowed by law.

109.

Defendant Ms. Angelo is personally liable for retaliation against the Plaintiffs under the ADA.

110.

Defendant Patterson is personally liable for retaliation against the Plaintiffs under the ADA.

111.

Defendant Gwin is personally liable for retaliation against the Plaintiffs under the ADA.

112.

Defendant FCSD is liable for retaliation against Plaintiffs under the ADA and Section 504.

113.

Plaintiffs are not required to exhaust ADA retaliation claims based on Title II, nor under 504, nor to exhaust such claims against individual defendants, nor compelled to do so under IDEA, as these claims do not seek the provision of FAPE under IDEA, and are not subject to exhaustion under Fry v. Napolean Community Schools, 580 U.S. ___, 137 S.Ct. 743 (2017), and its progeny.

114.

It is firmly established that parents of children with disabilities are protected against retaliation for advocacy for their protected rights. It arises explicitly under the ADA, and it has long been applied against retaliating administers in their personal capacity under binding Eleventh Circuit authority. Defendants know such actions are improper and that they each as different final decision makers also have a duty to otherwise protect K.K., H.K and D.K. from such retaliation, a duty they

intentionally, and with actual malice, ignored.

115.

Plaintiffs K.K., H.K., and D.K. have suffered damage and harm due to the retaliation of FCSD under 504, and FCSD, Patterson, Gwin and Angelo under the ADA for such damages and other relief as to be set in the enlightened conscience of the jury and bring a claim for punitive damages as against Patterson, Gwin and Angelo due to their personal malice under the ADA anti-retaliation provisions.

**COUNT 2:  42 U.S.C. § 1983 First Amendment Retaliation**

116.

The foregoing facts and paras. 1-94, 105, 107 are incorporated herein.

117.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

118.

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition

58

the Government for a redress of grievances.

U.S. Const. amend I.

119.

Plaintiff H.K.'s advocacy on behalf of K.K. and other students with disabilities in regard to their educational rights under state and federal law, is and remains a matter of public concern protected by the First Amendment.

120.

Defendant Angelo, Patterson and Gwin are officials of the Fayette County School District, and the actions alleged herein by them, and their failure to act or fulfill their duties to prevent and avoid retaliation, were taken under cover of such positions and under cover of state law. As the highest level relevant administrators of FCSD, including Patterson at the highest level as Superintendent of FCSD, their acts and those of FCSD counsel for them, may fairly be said to represent official policy of FCSD.

121.

Defendant Angelo, acting under color of state law and with the knowledge and endorsement of Patterson and Gwin, directly and/or through counsel for the District, Patterson and Gwin, filed a false report and/or a report with material omissions concerning what was known rendering that report misleading and

erroneous, alleging a serious crime to the Peachtree City Police Department

accusing H.K. of fraud based on the purported falsification of H.K.'s educational

records, imputing *inter alia* to Plaintiffs the crime of forgery in the first degree, <u>see</u>

O.C.G.A. § 19-9-1(b), a felony that is punishable by imprisonment for one to 15

years. O.C.G.A. § 19-9-2(a). Angelo lacked reasonable basis for believing that

Plaintiffs had committed fraud.

122.

Plaintiffs also had the District's counsel draft and send the letter of May 28,

2021 alleging fraud to chill and retaliate against Plaintiffs' former and prospective

exercise of free speech, advocacy, and to petition for redress of grievances

including their personal rights to contest the special education plan, and in

furtherance of their personal and collective actions to chill the free exercise of

protected rights and the right to petition for redress of grievances. This actual or

implicit threat, later coupling with a refusal to address or resolve the allegations,

was sufficient to deter a person of ordinary firmness from further exercising his or

her constitutional rights.

123.

Defendant Angelo's filing of a false or erroneous report missing exculpatory

evidence of a felony to law enforcement officers constitutes retaliatory action

sufficient to deter a person of ordinary firmness from exercising his or her

constitutional rights.

124.

Defendant Angelo's filing of a police report with omissions she knew

showed the absence of fraud, and the retaliation against the Plaintiffs for objecting

to programs, actions and services improper and discriminatory to students and

parents of children with disabilities, and seeking public records and participation,

as against H.K., as public and private acts of retaliation, violated clearly

established statutory and constitutional rights of H.K. and the Family of which a

reasonable person would have known.

125.

The Peachtree City Police Department's investigation into Ms. Angelo's

report against H.K. terminated in H.K.'s favor. The investigating officer

determined that the case lacked probable cause, based on the same information

known to Ms. Angelo at the time she filed the police report.  This the same

information known to FCSD, Patterson and Gwin when Angelo filed the

allegations against Plaintiffs and when Defendants had Morris, counsel to FCSD

and Patterson, send the threatening and defamatory May 28, 2020 "holiday" letter

to Mr. Zimring, accusing him and publishing defamation against H.K. and D.K.

61

126.

There is a causal link between H.K.'s advocacy on behalf of students with disabilities and Defendants' actions to chill her further exercise of rights including Ms. Angelo's filing of a meritless report of fraud.

127.

FCSD, through its counsel, threatened to file an ethics complaint and/or initiate criminal action against Plaintiffs' counsel based on the same information underlying Ms. Angelo's report to the Peachtree City Police. Defendants knew there were no grounds for an ethics complaint or criminal action based on these facts and the actions was taken to further chill their exercise of rights.

128.

FCSD's threat to initiate criminal action and/or to file a bar grievance against Plaintiffs' counsel constitutes retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights. Such actions were intended to deter the Plaintiffs and strip them of counsel, taken by Defendants FCSD, Patterson and Gwin through their counsel. This was intended to freeze their further actions and taint their expression and advocacy, and was done for this purpose and to have this effect, as it would for most people in their situation, and especially as parents of child including a child with a disability, with other children

also exposed to Defendants.

129.

There is a causal link between H.K.'s advocacy on behalf of students with disabilities and Ms. Morris's threat on behalf of FCSD, Patterson and Gwin to initiate criminal action and/or a bar grievance against H.K.'s counsel.

130.

Ms. Angelo's conduct in falsely accusing Plaintiffs and their counsel of criminal fraud was motivated by evil motive or intent and/or involves reckless or callous indifference to the federally protected rights of Plaintiffs, and maintained as such throughout the summer of 2021. The conduct of Angelo was known, endorsed and encouraged by Patterson and Gwin, similarly motivated by a false framing of the facts and by evil motive or intent and/or involves reckless or callous indifference to federally protected rights.

131.

Ms. Morris' sending of the letter of May 28 was known and endorsed by Patterson, and motivated by a false framing of the facts and by evil motive or intent and/or reckless or callous indifference to federally protected rights.

132.

Defendant FCSD is liable based on the actions of Patterson, Ms. Gwin

and/or Ms. Angelo and Ms. Morris, taken in its behalf by final actors and decision makers, for First Amendment retaliation against Plaintiffs under Section 1983.

133.

Defendants Angelo, Patterson and Gwin are subject to personal liability for First Amendment retaliation against Plaintiffs under Section 1983.

134.

Plaintiffs are not required to exhaust their Section 1983 First Amendment Retaliation claims under IDEA due process as against any individual Defendant, and further, not required to exhaust such claims as against FCSD, Patterson, Gwin and/or Angelo, as these claims do not raise claims as to FAPE under IDEA, and as they are allowed and are not subject to exhaustion under Fry v. Napolean Community Schools, 580 U.S. ___, 137 S.Ct. 743 (2017) and its progeny.

135.

Plaintiffs K.K., H.K., and D.K. have suffered damage and harm due to the retaliation of FCSD, Patterson, Gwin and Angelo and bring a claim for such special and actual damages and other relief as to be set in the enlightened conscience of the jury and allowed by the Court, and bring a claim for punitive damages as against Patterson, Gwin and Angelo due to their malice.

## COUNT 3: Defamation

136.

The foregoing facts and paras. 1, 3-9, 13-14, 17-22, 25-26, 28, 30-76, 78-91, 93-94, 131, 134 are incorporated herein.

137.

Slander or oral defamation consists in:

**(1)** ***Imputing to another a crime punishable by law;***
**(2)** Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society;
**(3)** Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or
**(4)** Uttering any disparaging words productive of special damage which flows naturally therefrom.

O.C.G.A. § 51-5-4(a) (emp. added).

138.

A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule.

O.C.G.A. § 51-5-1(a).

139.

Ms. Angelo, in calling and emailing Dr. Gurbal and Gurbal's staff on or about April 28, 2021, questioning the authenticity of Dr. Gurbal's reports regarding K.K. and in such improper communications contrary to right, imputed to

Plaintiffs, among other crimes and felonies, the crime forgery in the first degree, see O.C.G.A. § 16-9-1(b), a felony that is punishable by imprisonment for one to 15 years. O.C.G.A. § 16-9-2(a). These were intentional false and malicious accusations tending to injure the reputation of Plaintiffs and expose them to public hatred, contempt, and ridicule. They were made to an especial person to Plaintiffs.

140.

Ms. Angelo's communications with Dr. Gurbal and her staff regarding Gurbal's evaluation of K.K. were not privileged and instead violated the Parents' rights to privacy and to control access to the K.K. evaluations and her evaluators, and were unilaterally and secretly taken contrary to agreement FCSD provided between the FCSD and Plaintiffs, known to Angelo and which controlled her actions. Such actions were maliciously taken and wrongfully kept secret, contrary to law and without right. They caused and were designed to cause, and then maintained, as a communication and identification of false allegations kept from Plaintiffs, whereas following the consent agreement would have led to the truth of the falsity of the slanderous accusation. These actions were malicious and without contact or notice to Plaintiffs, and deceptive in a way which eliminated Angelo's discretion. Such actions were taken without right or privilege as intentionally contrary to the agreement of Notice and participation between FCSD and all its

agents and the Parents concerning such private providers.

141.

Ms. Angelo, in communicating with the Peachtree City Policy Department, including with Detectives Duckett and Lieutenant Williams, orally and in emails and in a "Victim/Witness Statement," falsely and maliciously, and/or with intention and negligence as to the truth, imputed to Plaintiffs, among other crimes and felonies, the crime of forgery in the first degree. These include intentional false and malicious accusations tending to injure the reputation of Plaintiffs and expose them to public hatred, humiliation, contempt, and ridicule. Angelo knew that these accusations were false as they omitted material facts when made. Angelo knew that allowing Plaintiffs notice of her concerns about the report was required and was abandoned as it might disclose the falsity of the accusations of criminal conduct.

142.

By letter of May 28, 2021, to Mr. Zimring, Ms. Morris falsely and maliciously accused Plaintiffs of committing fraud, in an intentionally vague threat, alluding to Plaintiffs intentionally altering Dr. Gurbal's report prior to providing it to the District, a crime that constitutes forgery in the first degree.  It was known that this accusation was false as made, and that specifics and further investigation would identify its falsity, and further that she, with the knowledge of

FCSD, Gwin and Angelo, had requested that the report be reformatted to allow

FCSD's access to it, and her intent in sending the letter was to threaten and harm

the Family, and/or to threaten and chill their advocacy and claims, and their

attorney's support for them. These include intentional false and malicious

defamations tending to injure the reputation of Plaintiffs and expose them to public

hatred, contempt, and ridicule. Ms. Morris's actions were taken at the direction of

Patterson and Gwin, taken for them and with their authority.

### 143.

Ms. Morris did not and in behalf of Patterson, Gwin and Angelo would not,

explain the basis for her May 28, 2021, accusation of fraud by H.K. and D.K., to

Mr. Zimring, as such would lead to the full facts and lack of cause for the

accusation, nor has she for such Defendants withdrawn this accusation following

the termination of the police investigation as unfounded without probable cause.

### 144.

Morris, Angelo, and Gwin falsely and maliciously imputed to Plaintiffs,

among other crimes and felonies, the crime of forgery in the first degree, and that

they had their counsel or that their counsel acting for them was fraudulently

altering documents for them and fraudulently providing such materials in their

behalf, accusations also knowingly without merit and as made for them by counsel,

itself malicious as also contrary to established standards and limitations from the Ethical Standards of the State Bar of Georgia.

145.

The actions including the statements and disclosures of the individual Defendants Patterson, Gwin and Angelo directly and by Morris, and as made to the police were not taken by right within the scope of their professional duties, nor taken with adequate investigation within any discretionary right, but were taken with personal malice to cause harm, to chill and accuse Plaintiffs.

146.

The actions of the individual Defendants Patterson, Gwin and Angelo as published, defamed and slandered the H.K. and D.K., accusing them of a crime, and were so egregious as to be slander *per se*, but also injured them and humiliated them constituting slander, and give rise to a claim for special damages and further relief in damages as against each individual Defendant in such amounts as to be set in the enlightened conscience of the jury, and as presented were with malicious intention, thereby supporting a claim for aggravated and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

1. Take jurisdiction of this matter;

2. Afford the Plaintiffs a jury trial on all claims which so allow;

3. Award the Plaintiffs actual damages as against FCSD, and Patterson, Gwin and Angelo personally, and punitive and aggravated damages as against Patterson, Gwin and Angelo on the ADA retaliation claims in such amounts as permitted and provided by law and jury determination;

4. Award the Plaintiffs actual damages as against FCSD on the Sec. 504 retaliation claims in such amounts as permitted and provided by law and jury determination;

5. Award the Plaintiffs actual damages as against FCSD, and against Patterson, Gwin and Angelo personally, and punitive and aggravated damages as against Patterson, Gwin and Angelo on the First Amendment retaliation claims in such amounts as provided by law and jury determination;

6. Award the Plaintiffs special damages, actual and general damages against Patterson, Gwin and Angelo, and for punitive and/or aggravated damages on the defamation claim in such amounts as provided by law and jury determination;

7. Award Plaintiffs their reasonable attorney fees and costs of litigation, as permitted by law; and

8.  Such other and further relief deemed just and proper.

Respectfully submitted this the 3<u>rd</u> day of March, 2022.

ZIMRING LAW FIRM
<u>/s/Jonathan A. Zimring</u>
JONATHAN A. ZIMRING
State Bar No. 785250

1425-A Dutch Valley Place
Atlanta, GA 30324
404.607.1600, ext.7001-404.607.1355 fax, zimring@zlawyers.com

CERTIFICATE OF COMPLIANCE

The undersigned certify that this pleading meets the Local Rule

requirements and is presented in an approved font, as Times New Roman, 14 point.

By:    *s/Jonathan A. Zimring*
Attorney for Plaintiffs

COMPLAINT EXHIBITS

Exhibit 1 – Letter, Morris to Zimring, May 28, 2021

Exhibit 2 – Email of Morris to Zimring, May 28, 2021

Exhibit 3 - Letter No. 1, Zimring to Morris, June 1, 2021

Exhibit 4 - Letter No. 2, Zimring to Morris, June 1, 2021

Exhibit 5 – Letter, Zimring to Morris, June 4, 2021

Exhibit 6 – Email of February 25, 2021

Exhibit 7 – Letter of Angelo with first of two Grand Jury subpoena